IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-12

No. 475A19

Filed 12 March 2021

IN THE MATTER OF: Q.P.W.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 16 September 2019 by Judge Tonia A. Cutchin in District Court, Guilford County. Heard in the Supreme Court on 13 January 2021.

*Mercedes O. Chut for petitioner-appellee Guilford County Department of Health and Human Services.*

*Christopher S. Edwards, for appellee Guardian ad Litem.*

*Wendy C. Sotolongo, Parent Defender, by Annick I. Lenoir-Peek, Deputy Parent Defender, for respondent-appellant mother.*

HUDSON, Justice.

Respondent-mother appeals from the trial court's orders terminating her parental rights to Q.P.W. (Quentin).[1] After careful review, we affirm.

## I.    Factual and Procedural History

Respondent-mother was the victim of a crime that left her pregnant at the age of thirteen. Respondent-mother was later placed in the custody of Guilford County Department of Social Services (DSS) pursuant to a juvenile dependency petition.

[1] A pseudonym is used in this opinion to protect the juvenile's identity and for ease of reading.

Quentin was born to respondent-mother on 8 March 2014. Shortly after he was born, respondent-mother left Quentin in the hospital for two days without informing hospital staff that she was leaving.

On 20 May 2014, Quentin was adjudicated to be a dependent juvenile after the trial court found that respondent-mother was too young to provide proper care for herself and Quentin, that respondent-mother had left Quentin in the hospital, and that respondent-mother was in DSS custody herself. Respondent-mother and Quentin were placed in the same foster home and remained in a joint placement, with only brief interruptions, from May 2014 to November 2017.

Respondent-mother entered into a case plan with DSS on 5 June 2014. Pursuant to her case plan at that time, respondent-mother was required to attend school, complete parenting education and training, attend Quentin's medical appointments, abide by the rules of her placement to avoid disruption, and participate in individual therapy. Quentin's primary permanent plan at that time was reunification. Initially, respondent-mother engaged in her case plan by attending school, participating in therapy, participating in parent education programs, and attending medical appointments with her son.

However, respondent-mother also disobeyed the rules of her placements and ran away from her placements causing several disruptions to her joint placement with Quentin from 2014 to 2016. Eventually, respondent-mother refused to

participate in additional parenting classes, stopped attending school, stopped participating in therapy, and continued to disrupt her placement.

¶ 6     On 2 June 2017, the trial court entered an order warning respondent-mother that her failure to comply with her case plan could result in a change to Quentin's primary permanent plan. By then, Quentin had been in over twelve placements.

¶ 7     Respondent-mother turned eighteen in November 2017 and was no longer eligible to continue placement with DSS because she was neither working nor attending school. As a result, her joint placement with Quentin was disrupted. From November 2017 through August 2018, respondent-mother had some contact with Quentin. On 10 August 2018, respondent-mother had her last visit with Quentin, and she failed to confirm a single subsequent visit as required by her case plan.

¶ 8     On 30 August 2018, DSS updated respondent-mother's case plan and identified areas for improvement including obtaining employment, improving her parenting skills, and obtaining stable housing. In October 2018, DSS identified respondent-mother's failure to address her mental health issues, her lack of stable housing, her failure to consistently visit with Quentin, her failure to comply with the recommendations from her parenting evaluation, and her failure to address her parenting deficits by completing parenting classes as barriers to achieving reunification.

¶ 9     On 16 November 2018, the trial court noted that respondent-mother had failed

to comply with requests for drug screenings, was not in appropriate housing, had failed to show up to work the previous week, had not attended any of Quentin's medical appointments since the last court date, had failed to attend therapy since 1 August 2018, and she had missed 21 visits with Quentin. The trial court found that respondent-mother was not actively participating in or cooperating with her case plan and found that she was not making adequate progress.

¶ 10         On 23 January 2019, the trial court terminated respondent-mother's visits with Quentin and named several barriers to reunification including respondent-mother's failure to participate in parenting classes, complete a psychological assessment and address her mental health needs, find safe and appropriate housing, and visit Quentin consistently. The primary plan for Quentin was changed to adoption. On 24 May 2019, the trial court found that respondent-mother was still not in compliance with the housing, parenting, and substance abuse portions of her case plan, and was not making adequate progress within a reasonable period of time.

¶ 11         In April 2019 DSS petitioned the trial court to terminate respondent-mother's parental rights (TPR petition) alleging that termination was appropriate under N.C.G.S. § 7B-1111(a)(1), (2), (3), (6), and (7). A hearing on the TPR petition was held on 13 and 14 August 2019. On 16 September 2019 the trial court entered an order terminating respondent-mother's parental rights pursuant to N.C.G.S. § 7B-1111(a)(1), (2), (3), (6), and (7) (TPR order). Respondent-mother filed a notice of

appeal on 18 September 2019.

## II.    Standard of Review

We have previously explained the standard of review for termination of parental rights appeals as follows:

> Proceedings to terminate parental rights consist of an adjudicatory stage and a dispositional stage. At the adjudicatory stage, the petitioner bears the burden of proving by clear, cogent, and convincing evidence that one or more grounds for termination exist under section 7B-1111(a) of the North Carolina General Statutes. We review a trial court's adjudication under N.C.G.S. § 7B-1109 to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law. The trial court's conclusions of law are reviewable de novo on appeal.

*In re K.H.*, 375 N.C. 610, 612 (2020) (cleaned up).

## III.    Analysis

In this case, the trial court determined that grounds existed to terminate respondent-mother's parental rights based on neglect, willful failure to make reasonable progress, willful failure to pay a reasonable portion of her child's cost of care, dependency, and willful abandonment. N.C.G.S. § 7B-1111(a)(1)–(3), (6)–(7) (2019). Respondent mother has not contested any findings of fact,[2] and thus, they are binding on appeal. *In re T.N.H.*, 372 N.C. 403, 407 (2019) ("Findings of fact not

---

[2] Respondent-mother discusses findings 19 and 26 in her brief, but her only argument is that these findings include irrelevant information. She makes no argument that these findings are not supported by clear, cogent, and convincing evidence. Furthermore, we do not rely on either of these findings in reaching our disposition.

challenged by respondent are deemed supported by competent evidence and are binding on appeal.").

¶ 14    We begin our review of the TPR order to determine whether the trial court's findings of fact support its conclusion that there were grounds to terminate respondent-mother's parental rights pursuant to N.C.G.S. § 7B-1111(a)(2), which provides as follows:

> The parent has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile. No parental rights, however, shall be terminated for the sole reason that the parents are unable to care for the juvenile on account of their poverty.

N.C.G.S. § 7B-1111(a)(2).

¶ 15    We have previously explained that:

> [t]ermination under this ground requires the trial court to perform a two-step analysis where it must determine by clear, cogent, and convincing evidence whether (1) a child has been willfully left by the parent in foster care or placement outside the home for over twelve months, and (2) the parent has not made reasonable progress under the circumstances to correct the conditions which led to the removal of the child.

*In re Z.A.M.*, 374 N.C. 88, 95–96 (2020).

¶ 16    First, we review whether the findings support the conclusion that Quentin had been willfully left in foster care or placement outside the home for more than twelve

months. "[T]he twelve-month period begins when a child is left in foster care or placement outside the home pursuant to a court order, and ends when the motion or petition for termination of parental rights is filed." *In re K.H.*, 375 N.C. at 613 (quoting *In re J.G.B.*, 177 N.C. App. 375, 383 (2006)). Here, DSS filed its TPR petition in April 2019. Therefore, the relevant twelve-month period is from April 2018 to April 2019.

The trial court made the following relevant findings of fact:

> 14. . . . [Respondent-mother] reached the age of majority on November 30, 2017. . . .
>
> . . .
>
> c. . . . [Respondent-mother] left her placement . . . after reaching the age of majority. . . .
>
> . . .
>
> 25. . . .
>
> a. The juvenile has been placed in foster care continuously since March 19, 2014.

These findings demonstrate that Quentin was in foster care and was not sharing a placement with his mother beginning in December 2017—more than twelve months before DSS filed the TPR petition.

Respondent-mother's willfulness can be established by evidence that she possessed the ability to make reasonable progress but was unwilling to make an effort. *In re Baker*, 158 N.C. App. 491, 494 (2003). The following portions of finding of

fact 14 are relevant to respondent-mother's willfulness:

> b. . . . [Respondent-mother] was asked to continue
> parenting education, to address her decision making.
> Parenting education was offered to [respondent-mother],
> but she chose not to attend any parenting classes.
> [Respondent-mother] was referred to PATE on March 31,
> 2017[.] . . . To date, [respondent-mother] has only
> completed one PATE class and has not made any contact
> with the facilitator to reengage in the program.
>
> . . .
>
> [Respondent-mother] refused to participate in a
> psychological evaluation and has indicated that she is tired
> of completing tasks for [DSS].
>
> . . .
>
> . . . Since reaching the age of majority on November 30,
> 2017, [respondent-mother] has not attended any medical
> appointments for the juvenile. . . . [Respondent-mother]
> has missed all her visits with the juvenile since August 10,
> 2018, and has not contacted [DSS] to inquire about
> reinstating visitation.
>
> c. . . . [Respondent-mother] was advised that Section 8 had
> openings . . . by [DSS] and [respondent-mother] was urged
> to go apply for the opening immediately. Despite being
> given this resource, [respondent-mother] moved out of her
> grandmother's home and is currently renting a room [in
> Greensboro]. . . . To-date [sic], [respondent-mother] has
> failed to demonstrate any stability with regard to her living
> situation, and she is not in compliance with this component
> of her case plan.
>
> d. . . . To date, [respondent-mother] has not completed a
> substance abuse assessment.

¶ 19    We determine that these findings support a conclusion of willfulness.

Therefore, the findings of fact in the TPR order support the conclusion that respondent-mother willfully left Quentin in foster care or placement outside the home for over twelve months prior to April 2019.

¶ 20     Next, we review whether the trial court's findings of fact support its conclusion that respondent-mother has not made reasonable progress to correct the conditions which led to the removal of Quentin. Regarding the conditions that led to the removal of the juvenile, the trial court made the following finding of fact:

> The conditions that led to the juvenile coming into custody include [respondent-mother's] inability to provide basic needs for herself and the juvenile due to [respondent-mother's] status as a minor child in the custody of [DSS]; [respondent-mother's] inability to provide the required medical care for the juvenile; lack of an appropriate adult caregiver for the juvenile; [respondent-mother] leaving the juvenile at the hospital for two days without anyone to make decisions for the juvenile and paternity had not been established.

Respondent-mother argues that the conditions that led to Quentin's removal were all attributable to her own minor status. She argues that the requirements of her case plan did not have a sufficient nexus to that condition. We disagree.

¶ 21     Our Court has previously explained that our appellate case law

> reflects a consistent judicial recognition that parental compliance with a judicially adopted case plan is relevant in determining whether grounds for termination exist pursuant to N.C.G.S. § 7B –1111(a)(2) even when there is no direct and immediate relationship between the conditions addressed in the case plan and the circumstances that led to the initial governmental

intervention into the family's life, as long as the objectives sought to be achieved by the case plan provision in question address issues that contributed to causing the problematic circumstances that led to the juvenile's removal from the parental home. The adoption of a contrary approach would amount to turning a blind eye to the practical reality that a child's removal from the parental home is rarely the result of a single, specific incident and is, instead, typically caused by the confluence of multiple factors, some of which are immediately apparent and some of which only become apparent in light of further investigation.

*In re B.O.A.,* 372 N.C. 372, 384–85 (2019).

¶ 22        Here, DSS modified respondent-mother's case plan and reviewed it several times to adjust for her changing circumstances as more information came to light about the barriers to reunification. The case plan requirements were tied to respondent-mother's need to demonstrate maturity and stability. For example, in order to care for Quentin, respondent-mother needed to learn parenting skills, demonstrate a commitment to Quentin on a sustained basis, and find stable housing and employment. We conclude that the case plan requirements were properly tied to alleviating the conditions which directly or indirectly contributed to the problematic circumstances that led to Quentin's removal—namely, respondent-mother's immaturity and instability.

¶ 23        Regarding respondent-mother's failure to make reasonable progress, the trial court made the following relevant findings of fact:

> 13. [Respondent-mother] has had the opportunity to correct the conditions that led to the juvenile's removal from the

home, including but not limited to being offered and entering into, a service agreement with [DSS]. [DSS] identified needs arising out of the conditions that led to the removal of the juvenile and developed a service agreement to assist [respondent-mother] in addressing those needs.

14. [Respondent-mother] . . . entered into the case plan on June 5, 2014. On March 26, 2018, . . . [respondent-mother's] case plan was updated. . . .The service agreement was reviewed on August 30, 2018, November 13, 2018, and February 11, 2019. . . .

. . . .

b. Parenting Skills/Mental Health—[Respondent-mother] has made minimal progress on the parenting component of her case plan. . . . [Respondent-mother] completed the parenting program at [her placement] in September 2014. Because [respondent-mother] continued to take the juvenile on unauthorized overnight stays with adults who were not authorized by [DSS], [respondent-mother] was asked to continue parenting education, to address her decision making. Parenting education was offered to [respondent-mother], but she chose not to attend any parenting classes. [Respondent-mother] was referred to PATE on March 31, 2017[.] . . . To date, [respondent-mother] has only completed one PATE class and has not made any contact with the facilitator to reengage in the program.

[Respondent-mother] completed a parenting assessment with Dr. McColloch on June 15, 2017. Dr. McColloch recommended that [respondent-mother] participate in a psychological evaluation, trauma focused therapy, individual counseling, and parenting classes. . . . [Respondent-mother] last attended therapy on August 1, 2018. . . . [Respondent-mother] refused to participate in a psychological evaluation and has indicated that she

is tired of completing tasks for [DSS].

. . . .

. . . Since reaching the age of majority on November 30, 2017, [respondent-mother] has not attended any medical appointments for the juvenile. When [respondent-mother] and the juvenile were no longer placed together, . . . [respondent-mother] was . . . allowed to have supervised visits with the juvenile at the foster home with the permission of the juvenile's foster parent. On October 17, 2018, due to [respondent-mother] missing twenty-one (21) visits with the juvenile, visitation between [respondent-mother] and the juvenile was reduced to one day per week for one hour. [Respondent-mother] subsequently failed to attend any of her scheduled visits with the juvenile, and her visits were suspended on January 9, 2019. [Respondent-mother] has missed all her visits with the juvenile since August 10, 2018, and has not contacted [DSS] to inquire about reinstating visitation. [Respondent-mother] is not in compliance with the parenting component of her case plan.

c. Placement/Housing—At the commencement of the underlying case, [respondent-mother's] only requirement under this component of her case plan was to comply with the rules and policies of her placement. . . . When [respondent-mother] has [sic] aged out of foster care the placement component of her case plan has [sic] changed to a requirement that [respondent-mother] obtain and maintain stable housing suitable for her and the juvenile. [Respondent-mother] has not made any progress on this component of her case plan. . . . On March 8, 2018, [respondent-mother] reported that she had her own apartment, however, the lease she provided on April 5, 2018 stated that the lease term ended on April 1, 2018. On July 26, 2018, [respondent-mother]

again reported that she had her own two-bedroom apartment paying $375.00 per month in rent. [Respondent-mother] went on to state that she was sharing the apartment with her sister but since her sister moved out, the rent was taking up her entire check. On August 10, 2018, [respondent-mother] reported that she was living with her mother because her apartment complex made her move out due to safety concerns. [Respondent-mother] explained that a domestic violence incident occurred between her and her ex-boyfriend, and the ex-boyfriend trashed her apartment. . . . On September 18, 2018, [respondent-mother] reported that she was living with her grandmother. [Respondent-mother] was advised that Section 8 had openings . . . by [DSS] and [respondent-mother] was urged to go apply for the opening immediately. Despite being given this resource, [respondent-mother] moved out of her grandmother's home and is currently renting a room [in Greensboro]. . . . To-date [sic], [respondent-mother] has failed to demonstrate any stability with regard to her living situation, and she is not in compliance with this component of her case plan. [Respondent-mother] entered into a Voluntary Placement Agreement on August 9, 2018. . . .

When [respondent-mother] entered into the Voluntary Placement Agreement she was residing . . . in her own apartment, but she moved out due to safety concerns with her ex-boyfriend. On August 30, 2018 [respondent-mother] reported that she was living with a friend [in Greensboro]. On September 18, 2018 [respondent-mother] reported that she was staying with her grandmother and great grandmother. . . . She advised Social Worker Young and Social Worker Stewart that she could not stay with her friend anymore. [Respondent-mother] was advised that all moves need to be reported in order to get approval. On November 16, 2018 Social Worker Stewart met with [respondent-mother] who

stated that things weren't going well and that she needed to be out of her grandmother's home by the end of the month. Ms. Stewart provided [respondent-mother] with housing resources. [Respondent-mother] moved [to another house]. She was renting a room in this house with several others. She was paying $250 per month for rent and was responsible for the light bill. On January 11, 2019 SW Stewart spoke with [respondent-mother] who stated that she had to leave her previous placement and was now living with her father because she has no place else to go. She was advised that her VPA will be terminated because she was living with her father and that they would meet the next week to get VPA termination papers signed. On January 22, 2019 SW Stewart spoke with [respondent-mother] who stated that she was now living with a friend [in Greensboro]. As of March 18, 2019, [respondent-mother] continue [sic] to reside at [that] address. She stated that she had put in an application for housing [elsewhere], however she still has an outstanding balance of $1000.00 on her housing record. [Respondent-mother] did advise [DSS] that she is currently living at another address but failed to provide the actual address.

d. Substance Abuse—[Respondent-mother] has not made any progress in addressing her substance abuse needs. . . . On October 10, 2018, Social Worker Young referred [respondent-mother] for a substance abuse assessment. . . . To date, [respondent-mother] has not completed a substance abuse assessment. On August 31, 2018, [respondent-mother] was asked to comply with a drug screen by no later than September 4, 2018. [Respondent-mother] did not comply. [Respondent-mother] was also asked to submit to a drug screen on September 18, 2018, and she did not comply. On October 17, 2018, [respondent-mother] was ordered by the court to submit to a drug screen by the end of the day.

> [Respondent-mother] submitted to a drug screen on October 18, 2018 and tested positive for marijuana. On November 13, 2018, the assigned social worker requested that [respondent-mother] submit to a random drug screen, and [respondent-mother] did not comply. As of the filing of the petition, [respondent-mother] has only submitted to one drug screen which was positive for marijuana. [Respondent-mother] is not in compliance with the substance abuse component of her case plan.
>
> . . . .
>
> 25. . . .
>
> . . . .
>
> b. The lack of reasonable progress under the circumstances is not due solely to the poverty of [respondent-mother] . . . but is the direct result of [her] failure to address the conditions that led to the removal of the juvenile, including [respondent-mother's] failure to maintain stable housing, failure to attend parenting classes, failure to cooperate with drug screens, [and] failure to attend visits . . . .

We conclude that these findings support the trial court's conclusion that respondent-mother failed to make reasonable progress under the circumstances to correct the conditions which led to Quentin's removal.[3]

## IV. Conclusion

We conclude that the trial court properly found that grounds existed to

---

[3] Respondent-mother argues that she has made reasonable progress, pointing to her participation in a DSS program for people transitioning out of foster care. However, her participation in that program alone is not sufficient to prevent or negate the conclusion that she has failed to make reasonable progress.

terminate respondent-mother's parental rights under N.C.G.S. § 7B-1111(a)(2). The trial court's conclusion that one statutory ground for termination existed is sufficient in and of itself to support termination of respondent-mother's parental rights. *In re E.H.P.,* 372 N.C. 388, 395 (2019). Therefore, we need not address respondent-mother's arguments regarding N.C.G.S. § 7B-1111(a)(1), (3), (6), and (7). Furthermore, respondent-mother does not challenge the trial court's conclusion that termination of her parental rights was in Quentin's best interests. *See* N.C.G.S. § 7B-1110(a) (2019). Accordingly, we affirm the trial court's order terminating respondent-mother's parental rights.

AFFIRMED.

Justice EARLS dissenting.

The result of the majority's decision today is that a nineteen-year-old mother who became pregnant when she was sexually assaulted as a thirteen-year-old girl will permanently and unnecessarily lose her right to maintain any relationship with her child. The trial court's findings of fact do not support the conclusion that petitioner has met its burden of "proving by clear, cogent, and convincing evidence the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes." *In re K.D.C.*, 375 N.C. 784, 788 (2020) (cleaned up). This decision is not compelled by North Carolina law and illustrates this Court's continued refusal to accord sufficient respect to a parent's fundamental constitutional-liberty interest in raising their child. Accordingly, I respectfully dissent.

## V. Factual Background

The circumstances underlying the present case are highly distressing. Respondent's own mother was convicted of aiding and abetting in the sexual assault perpetrated by a twenty-year-old man which led to respondent's pregnancy. After the assault, respondent was first placed with her grandmother, who quickly realized that she was unable to provide respondent with adequate care. On 5 March 2014, respondent was adjudicated to be a dependent juvenile and placed into the custody of the Guilford County Department of Social Services (DSS). Three days later, respondent gave birth to her son, Quentin. Twelve days after Quentin was born, he was also adjudicated to be a dependent juvenile due to respondent's "inability to care

for herself, much less an infant child."

Initially, respondent and Quentin were placed together in a foster home. Respondent entered into a case plan on 5 June 2014. Although respondent occasionally exhibited disruptive or inappropriate behaviors while in foster care, she substantially complied with her case plan and made continuous progress towards reunification over the next four years, despite experiencing frequent instability as she was moved between numerous foster care placements. There is no evidence in the record that respondent ever abused Quentin, nor is there evidence that her behaviors ever exposed Quentin to a significant risk of harm. Respondent aged out of the foster care system when she turned eighteen on 30 November 2017. Less than two years later, the trial court terminated her parental rights to Quentin.

## VI.    Willful Failure to Make Reasonable Progress Under the Circumstances: N.C.G.S. § 7B-1111(a)(2)

In affirming the trial court's order terminating respondent's parental rights on the grounds that she has willfully failed to make reasonable progress towards correcting the conditions that led to Quentin's removal, the majority ignores the myriad constraints on respondent's ability to comply with her case plan imposed by respondent's circumstances. This unwillingness to examine the realities of respondent's situation—particularly her age and her recent experience attempting to transition out of the foster care system—is inconsistent with the "ongoing examination of the circumstances" we have previously deemed appropriate in

assessing a respondent-parent's reasonable progress under N.C.G.S. § 7B-1111(a)(2). *In re B.O.A.*, 372 N.C. 372, 382 (2019). Accordingly, I disagree with the majority's approach and would instead hold that the trial court was required to consider respondent's holistic circumstances in assessing both the willfulness of her conduct and the reasonableness of the progress she made towards correcting the conditions that led to Quentin's removal.

¶ 29        Pursuant to N.C.G.S. § 7B-1111(a)(2), a court may terminate a respondent-parent's parental rights when the parent has "willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile." N.C.G.S. § 7B-1111(a)(2) (2019). We have previously explained that "[w]illfulness is established when the respondent had the ability to show reasonable progress, but was unwilling to make the effort." *In re S.M.*, 375 N.C. 673, 685 (2020) (quoting *In re McMillon*, 143 N.C. App. 402, 410, *disc. review denied*, 354 N.C. 218 (2001)); *see also In re Matherly*, 149 N.C. App. 452, 455 (2002) ("Evidence showing a parents' ability, or capacity to acquire the ability, to overcome factors which resulted in their children being placed in foster care must be apparent for willfulness to attach."). A trial court cannot fulfill its obligation to assess willfulness when it blinds itself to important context. The trial court must consider that context even if some of the relevant events

occurred before the respondent-parent reached the age of majority. In this case, respondent's experiences both within and immediately upon leaving the foster care system are relevant in assessing the willfulness of the conduct which forms the basis of DSS's termination petition. *See In re Pierce*, 356 N.C. 68, 75 n.1 (2002) ("[T]here is no specified time frame that limits the admission of relevant evidence pertaining to a parent's 'reasonable progress' or lack thereof.").

¶ 30        For four years after giving birth to Quentin at the age of fourteen, respondent continued making progress towards reunification with her son to the repeated satisfaction of the trial court. She continued making progress even while she was moved across multiple placements and while dealing with all of the ordinary challenges of adolescence, compounded by the fact that she was a minor parent who was herself in DSS custody. Throughout this difficult period, respondent remained committed to learning to parent Quentin. She undeniably developed a meaningful bond with her child. Her persistence in the face of tremendous adversity suggests that her conduct which forms the basis of the underlying termination petition— conduct which occurred during a short period of time immediately after the respondent reached the age of majority and while she was attempting to make the difficult transition from foster care to independent living—reflected difficulties inherent in her unique circumstances which would be resolved in time, rather than a willful failure to make reasonable progress within the meaning of N.C.G.S. § 7B-

1111(a)(2).[1] *Cf. Lecky v. Reed*, 20 Va. App. 306, 312 (1995) (holding that termination of minor parent's parental rights was warranted because "[n]othing in this record attributes mother's parental deficiencies to her age or suggests that the mere passage of time would resolve her difficulties").

¶ 31      The trial court's and the majority's steadfast refusal to fully consider respondent's circumstances is also inconsistent with the realities of adolescent development. Although our legal system often draws a sharp distinction between "minors" and "adults," this binary does not account for the fact that "psychological, social, and economic forces have shifted the way that people experience their late teens and early twenties." Clare Ryan, *The Law of Emerging Adults*, 97 Wash. U. L. Rev. 1131, 1147 (2020). Scientific research has demonstrated that "the years from the late teens to the early twenties constitute a transitional period that bridges adolescence and mature adulthood" where "[d]evelopment is gradual, and the psychological boundaries between adolescence and adulthood are fuzzy." Elizabeth S. Scott et al., *Young Adulthood As a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641, 645 (2016). The Court of Appeals has held that if a respondent-parent has not yet turned eighteen when DSS files its

---

[1] It is notable that in regard to respondent's final foster care placement before reaching the age of majority, the trial court found that respondent "did very well in her placement with [the foster parent] as [the foster parent] provided strong support and guidance for respondent to learn parenting skills." Respondent only left this placement when she aged out of the foster care system upon turning eighteen.

termination petition, the trial court is required to "make specific findings of fact showing that a minor parent's age-related limitations as to willfulness have been adequately considered." *In re Matherly*, 149 N.C. App. at 455. I agree with the Court of Appeals and would hold trial courts to the same requirement when the respondent-parent is a young adult, especially when, as here, many of the pertinent events occurred prior to the parent reaching the age of majority.[2]

¶ 32    We need not and should not adopt the fictitious presumption that everything respondent did after she turned eighteen was willful. Instead, we should examine her circumstances and capacities holistically, acknowledging "[r]ecent research in neuroscience and developmental psychology [which] indicates that individuals between the ages of 18 and 21 share many of the[ ] same characteristics" as minors. *Pike v. Gross*, 936 F.3d 372, 385 (6th Cir. 2019) (Stranch, J., concurring), *cert. denied*, 207 L. Ed. 2d 171 (U.S. 2020). This research has particular implications for children in foster care who must immediately attempt to live independently at age eighteen. "It is now well established among social scientists that young adults who emancipate from foster care, when compared to their peers, are far more likely to suffer from

---

[2] Regardless, the trial court made numerous factual findings regarding incidents which occurred prior to respondent reaching the age of majority, including factual findings regarding her purported disruption of foster care placements. The trial court relied on these factual findings in arriving at its ultimate conclusion that respondent had willfully failed to make reasonable progress to correct the conditions that led to Quentin's removal. However, a legitimate question arises in this case of whether respondent's conduct relating to correcting those conditions was willful during the period that she was in foster care. The trial court's factual findings do not address that question.

homelessness, unemployment, unplanned pregnancy, lack of health care, and

incarceration, among other problems." Bruce A. Boyer, *Foster Care Reentry Laws:*

*Mending the Safety Net for Emerging Adults in the Transition to Independence,* 88

Temp. L. Rev. 837, 837 (2016). As Boyer explains:

> Both social scientists and neurologists now recognize that
> true "adult" functioning, measured in terms of cognitive,
> behavioral, and social maturity, is not achieved for the
> majority of emerging adults until well into the third decade
> of life. During this transitional phase, while most young
> people begin the process of separating from their families,
> few do so precipitously or without setbacks. Studies
> generally place the median age at which adolescents first
> leave home in the early twenties, and many of those
> adolescents who leave home for the first time between the
> ages of eighteen and twenty-four return to live in their
> parental households at some time thereafter, even if only
> for a short time. One recent study found that
> approximately 55% of young men and 46% of young women
> between eighteen and twenty-four years old were living at
> home with one or both of their parents. Other studies have
> concluded that the average age at which children in the
> general population finally depart the home is twenty-eight.
> The staging of the transition to independence is
> particularly indispensable for youth from less well-off
> families seeking to balance work, school, and the
> achievement of the credentials needed to sustain
> independence.

*Id.* at 840–41 (footnotes omitted). The failure to examine respondent's progress in

light of this context is a legal error because it reflects a failure to properly apply the

statutory mandate to consider respondent's reasonable progress "under the

circumstances." N.C.G.S. § 7B-1111(a)(2).

¶ 33        Therefore, in this case, the trial court's findings do not support the conclusion that respondent "had the ability to show reasonable progress, but was unwilling to make the effort." *In re S.M.*, 375 N.C. at 685 (quoting *In re McMillon*, 143 N.C. App. at 410). The evidence instead only indicates that respondent failed to make more progress than she did due to her limited capacities as a very young parent who was attempting to live independently for the first time, without the benefit of adequate financial resources or a support network. Although the state maintains a substantial interest in the welfare of all children in North Carolina, including those born to minor parents, consideration of a young parent's circumstances is consistent with the Juvenile Code's goals of protecting juveniles "by means that respect both the right to family autonomy and the juveniles' needs" while "preventing the unnecessary or inappropriate separation of juveniles from their parents." N.C.G.S. § 7B-100(3)–(4) (2019).

¶ 34        Additionally, the majority misses the mark in summarily disregarding respondent's "participation in a DSS program for people transitioning out of foster care." Although respondent acknowledges that she did not fully comply with her case plan after reaching the age of majority, she argues that her engagement with the NC LINKS program—which provides services to young adults exiting the foster care system to help them attain education, employment, health, and housing stability—is relevant in assessing whether she made reasonable progress towards correcting the

conditions which led to Quentin's removal. In this case, as the majority notes, the requirements of respondent's case plan "were tied to [her] need to demonstrate maturity and stability." Certainly, respondent's participation in a program designed to assist young adults in achieving positive life outcomes is a possible indicator of her increased maturity. Because participation in the NC LINKS program is entirely optional, respondent's choice to seek out additional support could reflect an awareness of her own limitations and a recognition that she needed help in order to adequately care for herself and her son. Further, if respondent's participation in the NC LINKS program helped her advance her education, obtain employment and housing, and improve her mental and physical health, then she would have made substantial progress towards addressing the material conditions which rendered her unable to parent Quentin.

¶ 35        We have never held that a respondent-parent's compliance, or lack thereof, with a DSS case plan is dispositive in determining whether the requirements of N.C.G.S. § 7B-1111(a)(2) have been met. This statutory ground does not permit termination of parental rights merely on the basis that a respondent-parent has failed to comply with his or her case plan. *In re E.C.*, 375 N.C. 581, 585 (2020) ("A trial court should refrain from finding that a parent has failed to make reasonable progress in correcting the conditions that led to the children's removal 'simply because of his or her failure to fully satisfy all elements of the case plan goals.' "

(quoting *In re B.O.A.*, 372 N.C. at 385)). Rather, it permits termination only when a parent has failed to make "reasonable progress under the circumstances" towards "correcting those conditions which led to the removal of the juvenile." N.C.G.S. § 7B-1111(a)(2). A parent's compliance with a case plan is often evidence that he or she has made reasonable progress under the circumstances because case plans are typically developed to address the specific conditions which led to a child's removal. *See In re J.S.*, 374 N.C. 811, 815–16 (2020) ("[I]n order for a respondent's noncompliance with her case plan to support the termination of her parental rights, there must be a nexus between the components of the court-approved case plan with which the respondent failed to comply and the conditions which led to the child's removal from the parental home." (cleaned up)). However, it is possible for a parent to make reasonable progress towards addressing the substantive conditions which led to a child's removal from the parental home in a manner other than the one specified in a DSS-approved case plan. *See, e.g.*, *In re K.D.C.*, 375 N.C. at 792 (holding that petitioner had failed to prove grounds existed under N.C.G.S. § 7B-1111(a)(2) where "respondent-mother failed to complete a parenting class as required by her case plan, . . . [but] completed a 'Mothering' class, which appears to be at least a plausible attempt by respondent-mother to complete her case plan and to improve her parenting skills"). Accordingly, the trial court erred in failing to consider respondent's participation in the NC LINKS program as probative evidence of her

progress towards addressing the conditions that led to Quentin's removal. If respondent was able to address the substantive barriers preventing her from caring for Quentin through her participation in the NC LINKS program, then N.C.G.S. § 7B-1111(a)(2) does not supply a ground for terminating her parental rights.

¶ 36          Finally, the trial court erred in failing to assess whether respondent's inability to meet the requirements of her case plan stemmed from her poverty, rather than her willful conduct. *See In re M.A.*, 374 N.C. 865, 881 (2020) ("[P]arental rights are not subject to termination in the event that [a parent's] inability to care for her children rested solely upon poverty-related considerations . . . ."). The trial court's bare assertion that "[t]he lack of reasonable progress under the circumstances is not due solely to the poverty of [respondent], but is the direct result of [her] failure to address the conditions that led to the removal of the juvenile," is puzzling given the evidence that respondent's lack of financial resources caused her to be unable to meet the conditions of her case plan. For example, the trial court notes that respondent "had put in an application for housing" but that "she still ha[d] an outstanding balance of $1000.00 on her housing record." The record discloses that respondent made numerous efforts to obtain housing after reaching the age of majority. Thus, there is evidence in the record indicating that respondent's poverty, rather than a lack of effort, directly caused her continued inability to maintain stable housing. The trial court's conclusory finding that respondent's lack of progress was not due to poverty

is insufficient to support the legal conclusion that respondent had the actual ability to comply with the conditions imposed by her case plan. *Cf. In re McMillon*, 143 N.C. App. at 412 (affirming order terminating parental rights despite respondent's claim that he was impoverished because "[t]he components of the DSS plan did not require material resources"); *In re A.W.*, 237 N.C. App. 209, 217 (2014) (affirming order terminating parental rights when "there was a sufficient basis in the record for terminating the Father's parental rights that had nothing to do with poverty").

## VII. Other Grounds

¶ 37    Having wrongfully affirmed the portion of the trial court's order concluding that respondent willfully failed to make reasonable progress within the meaning of N.C.G.S. § 7B-1111(a)(2), the majority does not address any of the other grounds for terminating respondent's parental rights adjudicated by the trial court. With regard to these other grounds, I would also hold that the trial court's conclusions are not supported by clear, cogent, and convincing evidence.

¶ 38    First, there is insufficient evidence in the record to support the conclusion that grounds exist to terminate respondent's parental rights on the basis of neglect. The trial court's sole conclusion of law supporting termination pursuant to N.C.G.S. § 7B-1111(a)(1) is that respondent was presently neglecting Quentin based on her failure to comply with her case plan. However, respondent's failure to comply with her case plan cannot establish ongoing neglect in this case because respondent has not had

custody of her son for many years. Because there is insufficient evidence that Quentin was a neglected child within the meaning of N.C.G.S. § 7B-101(15), petitioner must prove that respondent previously neglected Quentin and that she is likely to do so again in the future. *In re R.L.D.*, 375 N.C. 838, 841 n.3 (2020). The only evidence of prior neglect that petitioner can point to is respondent's conduct in the immediate aftermath of giving birth to Quentin as a fourteen-year-old, when she left Quentin in the hospital for two days. There is no evidence that Quentin was in any way harmed by respondent's brief absence. Accordingly, I would hold that the record does not support the conclusion that respondent's parental rights may be terminated under N.C.G.S. § 7B-1111(a)(1).

¶ 39        Second, the evidence presented at trial does not support the conclusion that respondent willfully failed to pay a reasonable portion of the cost of caring for Quentin pursuant to N.C.G.S. § 7B-1111(a)(3). The evidence indicates that respondent made three child support payments during the six months preceding the filing of the termination petition. The evidence also indicates that the total amount paid by respondent was less than the total amount she owed during this period. This Court has not addressed whether the ground provided for in N.C.G.S. § 7B-1111(a)(3) is automatically triggered whenever a parent fails to pay the full amount of a valid child support obligation. Regardless, the evidence establishes that respondent did not fail to pay a reasonable portion of the cost of care "for a *continuous period of six months*

immediately preceding the filling of the petition" because she paid the full amount of child support owed for a monthly period on at least one occasion during these six months. N.C.G.S. § 7B-1111(a)(3) (emphasis added). Accordingly, I would hold that N.C.G.S. § 7B-1111(a)(3) does not support the termination of respondent's parental rights.

¶ 40        Third, the record evidence plainly does not support the conclusion that respondent is incapable of caring for Quentin within the meaning of N.C.G.S. § 7B-1111(a)(6). According to the trial court, this ground for termination has been met because respondent once tested positive for marijuana. However, as Quentin's guardian *ad litem* rightly conceded in its brief, evidence that a parent uses drugs is insufficient to prove that the parent is incapable of caring for his or her child absent a finding that the parent's drug use will "prevent the parent from providing [the child with] proper care and supervision." *In re D.T.N.A.*, 250 N.C. App. 582, 585 (2016). The record is bereft of any evidence suggesting that respondent's purported substance abuse problem caused her to be "incapable of providing for the proper care and supervision of" Quentin. N.C.G.S. § 7B-1111(a)(6). Thus, the trial court erred in concluding that the requirements of N.C.G.S. § 7B-1111(a)(6) had been met.

¶ 41        Finally, the record does not support the conclusion that respondent willfully abandoned Quentin within the meaning of N.C.G.S. § 7B-1111(a)(7). In order to establish willful abandonment, there must be evidence establishing that respondent

evinced a "purposeful, deliberative and manifest willful determination to forego all parental duties and relinquish all parental claims to [the child]." *In re A.G.D.*, 374 N.C. 317, 319 (2020) (alteration in original) (quoting *In re N.D.A.*, 373 N.C. 71, 79 (2019)). Here, respondent made multiple child support payments in the six months immediately preceding the filing of the termination petition. In addition, she enrolled in the NC LINKS program, purportedly in an effort to address the deficiencies which prevented her from providing for Quentin as his parent. These actions are inconsistent with the conclusion that respondent "deliberately eschewed . . . her parental responsibilities in their entirety." *In re E.B.*, 375 N.C. 310, 318 (2020). Accordingly, I would hold that petitioner has not met its burden of proving that respondent willfully abandoned Quentin pursuant to N.C.G.S. § 7B-1111(a)(7).

## VIII. Conclusion

¶ 42        Simply put, neither the termination statutes nor our precedents endorse the blinkered approach the majority adopts in reviewing the trial court's order terminating respondent's parental rights. The majority's analysis entirely ignores the likelihood that respondent's behavior in the year subsequent to reaching the age of majority was substantially influenced by the conditions she lived in during the preceding years when she was in DSS custody. To the extent that respondent may have lacked the resources or capacity to parent Quentin immediately upon turning eighteen, then DSS itself bears a substantial share of the responsibility as her

caregiver. The outcome of the majority's decision unfairly punishes a young mother who has exhibited remarkable fortitude in striving to raise her child under difficult circumstances. Accordingly, I would vacate the trial court's order terminating respondent's parental rights and remand for further factfinding which considers all of the relevant evidence, including her circumstances, financial resources, and participation in the NC LINKS program, in determining whether she willfully failed to make reasonable progress in correcting the conditions which led to Quentin's removal.